DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ROYCE TEETS,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D19-2253

[June 23, 2021]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Ernest A. Kollra, Judge; L.T. Case No. 16-8494CF10A.

Carey Haughwout, Public Defender, and Breanna Atwood, Assistant Public Defender, West Palm Beach, for appellant.

Ashley Moody, Attorney General, Tallahassee, and Alexandra A. Folley, Assistant Attorney General, West Palm Beach, for appellee.

MAY, J.

The defendant appeals his conviction and sentence. He first argues the trial court erred in failing to hold a *Richardson*[1] hearing and in admitting the State expert's trigger pull test results. In his second issue, he argues the court erred in denying his motion for mistrial. We disagree on both issues and affirm.

The case stems from the defendant's fatal shooting of his fiancé during an argument. The State charged the defendant with one count of second-degree murder with a firearm and two counts of felon in possession of a firearm. He claimed to have accidentally shot the victim.

After the shooting, the defendant called 911 for assistance. He informed the operator that a woman had been shot and was going to die. When the 911 operator asked him what happened, the defendant responded: "We were messing with this assault rifle, and it went off, and

---

[1] 246 So. 2d 771 (Fla. 1971).

it hit her her [sic] chest."  He said he was scared and "didn't know there was one in the chamber."

The police arrived at the residence within a couple of minutes.  The defendant unlocked the front door and ran back to the living room where the victim was unconscious on the floor.  He was hysterical and kept saying, "You got to help her . . . don't let her die."

Minutes later, paramedics arrived and pronounced the victim dead.  The defendant told the responding officers that the victim accidentally shot herself while cleaning the rifle.  The defendant agreed to go to the police department for questioning.

### Defendant's Statement Before the Search

A police detective interrogated the defendant before and after the residence was searched.

Before the search was executed, the defendant told police the victim was drunk and became angry when she learned the defendant's ex-girlfriend was texting him.  The argument escalated and the victim started yelling:  "I'm going to kill you, I'm going to kill you."  She then got up and ran toward the bedroom closet where the defendant kept his guns.

The defendant warned her not to touch the guns and reached the closet before her.  He then grabbed one of the guns and pulled the clip off.  He had "no idea" a bullet remained inside the chamber.

They continued arguing and the victim followed him into the kitchen.  The victim walked in front of him and reached for the gun.  When the victim grabbed the gun from the bottom, the weapon fired.  The defendant did not remember his finger being on the trigger, but claimed the gun had a "hair trigger" that responded to the slightest touch.

### Search of Defendant's Home

The officers that executed the search warrant saw the victim lying on the living room floor with an e-cigarette next to her left hand.  They found a bullet hole in the wall that was located about ten to twelve inches above the floor.  An AK-47 rifle with a live, unspent round was found on the kitchen counter.

The master bedroom was in disarray with shattered glass on the floor and a broom on the bed.  A gun clip was lying on top of an ottoman.  A live

2

round was lying on the floor.  The detectives also found a partially full box of ammunition, loaded magazines, and more rounds.

### Defendant's Post-Search Statement

The detective continued to interrogate the defendant.  He told him his story was inconsistent with what they had discovered during the search.  The defendant then admitted the victim did not walk in front of him to grab the gun as he had stated before, and that he had not removed the clip from the gun.  Instead, he grabbed the gun, racked it, and a bullet came out.  This led him to believe the gun was empty.

When the victim went into another room to adjust the thermostat, he ran toward her to scare her.  The gun fired, but he did not intentionally squeeze the trigger.  He then removed the clip from the gun and began looking for his cell phone to call 911.

### The Trial

The State called a firearms expert to testify about the pressure needed to pull the trigger or trigger pull weight.  Before the firearms expert testified, defense counsel expressed concern about the trigger pull test results and the use of a demonstrative aid.

> **Defense Counsel:**  Judge, and one of the reasons I am also concerned is I reviewed the investigative analysis performed by our investigator in this case, fairly early on, but his report reflects that we did not have a report of the trigger pull on this weapon at that point in time.  I don't recall having gotten it since.   It's probably my—something that I must have misplaced, if you can show it to me.

> **State:**  Judge, trigger pull is not something that is put in the report.  That's something that's discussed in deposition.  It's part of the examiner's notes.  The defense did not depose the witness.

> **Defense Counsel:**  So I've had no previous knowledge of this at all, Judge.  Then this is being sprung on me.

> **State:**  Absolutely, it's not, Judge.  [H]is client is the one who brings up trigger pull.  And if he was interested in what the trigger pull on this weapon was before we came in here, he had full opportunity to depose the witness.  He chose not to.

**Trial Court:** Over defense objection, I am going to allow.

**State:** Thank you.

**Defense Counsel:** And, Judge, for the record, my objection is there needs to be some sort of report, some sort of discovery turned over to the defense, prior to trial about what a very important piece of evidence is. They can't simply say, "If you didn't depose him, you're not entitled to it," because they have to give us all the reports.

**Trial Court:** Entitled to what? They said there's no reports.

**State:** And, Judge, as defense counsel stated in his opening, in all his years of experience, he knows that the firearms examiner as well as the DNA analyst, they keep files. The State is not privy to the notes unless they're court ordered. In this case, we never got a court order. I pretried my witness, that's how I know what the trigger pull is. He had full opportunity, and this is the second firearms analyst on the case.

Defense counsel objected to the use of a five-pound weight as a demonstrative aid. Defense counsel noted that the results showed the gun had a trigger pull weight of four-and-a-half pounds. The court asked:

**Trial Court:** . . . I presume that there's going to be some testimony to the effect that if something is required for four and a half to five pounds of pressure, it is not a hair trigger; is that what we're going to hear here?

**State:** Yes, absolutely. It's far from it.

**Defense Counsel:** And I have no objection to that, Judge, but if [the demonstrative aid] could have been four and a half [pounds], and they're going to hand the Jury something that's five, that's improper, as you can feel the difference. It's significant.

Ultimately, the State agreed to use a four-and-a-half-pound weight in place of the five-pound weight. Defense counsel then told the court that, "while my objection is no longer as strong, I would still object to the process of asking each juror to make an independent determination of what that

weight is and how it feels." The trial court disagreed, stating that the demonstrative aid was a proper device that would help the jury understand the evidence.

The court overruled the objection and reserved ruling on the admissibility of a demonstrative aid on the gun's trigger pull.

The State expert testified the gun did not have a hair trigger as the defendant claimed. Over defense counsel's renewed objection, each juror was permitted to test the demonstrative aid, a four-and-a-half-pound weight simulating the trigger pull weight. The State also introduced DNA evidence showing the defendant's DNA was found on the grip area of the gun.

The defendant testified at trial. He claimed he accidentally shot the victim; he believed the gun was unloaded. He claimed the gun went off when the victim tried to grab the gun. He dropped the gun in shock, but then picked it up and placed it on the kitchen counter. He removed the clip and placed it on the ottoman, where his phone was lying. He called 911.

The jury found the defendant guilty of second-degree murder. It found he possessed and discharged a firearm resulting in the victim's death. The defendant entered an open plea to counts two and three. The trial court sentenced him to life in prison with a twenty-five-year mandatory minimum on count one and fifteen years each on counts two and three.

The defendant now appeals.

The defendant argues the trial court should have conducted a *Richardson* hearing when he objected to the State's use of the trigger pull test results and demonstrative aid. The trial court should have inquired about the circumstances surrounding the State's discovery violation and examined whether the violation procedurally prejudiced his defense. The court would have determined that the State's failure to disclose the trigger pull test results was prejudicial because his defense was that the gun was accidentally discharged due to its light trigger pull.

The State responds no *Richardson* hearing was required because no discovery violation occurred. There was no report on the trigger pull test results. The results were part of the expert's notes, which are not subject to discovery. And, the defendant chose not to take the expert's deposition. The State alternative argues the issue was waived when defense counsel

objected only to the use of a five-pound weight. And last, any error was harmless.

We review "a trial court's decision on a *Richardson* hearing for an abuse of discretion." *Jules v. State*, 178 So. 3d 475, 478 (Fla. 4th DCA 2015).

"Florida's criminal discovery rules are designed to prevent surprise by either the prosecution or the defense. Their purpose is to facilitate a truthful fact-finding process." *Id.* (quoting *Kilpatrick v. State,* 376 So. 2d 386, 388 (Fla. 1979)). "[A]n inquiry pursuant to *Richardson* should be made by the trial court when a violation of the discovery rules occurs . . . ." *Id.* (alteration in original) (citation omitted) (quoting *Cuciak v. State,* 410 So. 2d 916, 917 (Fla. 1982)).

However, "'it is only *after* the trial court finds a discovery violation' that it must inquire into whether the State's discovery violation was (1) inadvertent or willful, (2) trivial or substantial, and (3) whether it procedurally prejudiced the opposing party's ability to prepare for trial." *Smith v. State*, 283 So. 3d 817, 820 (Fla. 4th DCA 2019) (quoting *Knight v. State*, 76 So. 3d 879, 888 (Fla. 2011)). In other words, "a trial court is not required to conduct a *Richardson* hearing where it has not first determined that a discovery violation has occurred." *Id.*

The defendant's reliance on *Richardson* is misplaced. No *Richardson* hearing was required here because no discovery violation occurred. Before trial, the State disclosed the "Crime Laboratory Analysis Report" in discovery. The defendant was therefore on notice the State tested and examined the weapon. He should have reasonably expected the State to test the gun's operability and examine its features, including the trigger pull weight. But the defendant chose not to depose the expert. His claim is therefore barred because reasonable diligence would have led to the discovery of the evidence.

The defendant also fails to recognize the expert's notes on the trigger pull test results were not subject to disclosure. In *Geralds v. State*, 601 So. 2d 1157 (Fla. 1992), our supreme court, relying on the Florida Rules of Criminal Procedure, held that field notes by a crime laboratory analyst and crime scene coordinator are exempt from disclosure. The supreme court reiterated that principle in *Terry v. State*, 668 So. 2d 954 (Fla. 1996) (law enforcement analysts' notes are exempt from disclosure, notwithstanding they were written in the lab and not in the field).

Because the State turned over the firearms evidence report, and the expert's notes were not subject to disclosure, the trial court did not abuse

its discretion in finding no discovery violation. In any event, any error was harmless based on this record. There is no reasonable possibility the defense strategy would have been materially different if the trigger pull test results had been disclosed. *See State v. Schopp*, 653 So. 2d 1016, 1021 (Fla. 1995) ("[O]nly if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.").[2]

*Affirmed.*

LEVINE, C.J., and FORST, J., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***

---

[2] We find no merit in the other issue raised.